SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**Kathleen M. Moynihan v. Edward J. Lynch** **(A-64-20) (085157)**

**Argued November 29, 2021 -- Decided March 8, 2022**

**ALBIN, J., writing for a unanimous Court.**

Plaintiff Kathleen Moynihan and defendant Edward Lynch were involved in a long-term "marital-style relationship." Anticipating the potential dissolution of that relationship, they signed and notarized a written agreement, without the assistance of counsel, that finalized the financial obligations each owed to the other. In this appeal, the Court considers the validity of that palimony agreement.

The parties met in 1997 and developed a romantic relationship. In the beginning, Lynch occasionally slept at Moynihan's home. In 2000, Moynihan and her children moved to a home in Bordentown. Moynihan made the down payment on the home, which Lynch purchased with a mortgage and titled in his name. The parties shared the financial responsibilities of the home. Over time, Lynch moved into the home and became more active in the life of the Moynihan family. The parties discussed marriage but never wed.

In 2007, Lynch placed the title of the home into a trust and named Moynihan as the beneficiary upon his death. In 2013, Lynch converted his ownership of the home into a joint tenancy with rights of survivorship, naming himself and Moynihan on the deed.

Sometime between 2012 and 2014, the parties entered into a handwritten agreement, drafted by Lynch, which provided that, within five years of vacating their jointly owned home, Lynch would pay off the mortgage, deed it over to Moynihan, pay her $100,000, and, within two years of vacating the home, pay the real estate taxes on the property for two years. In 2015, the parties parted ways, and Lynch refused to abide by their written agreement.

Moynihan filed a complaint seeking enforcement of the written agreement and an alleged oral palimony agreement that she claimed the parties had entered before the Legislature in 2010 amended N.J.S.A. 25:1-5 to include subparagraph (h). That amendment mandated that palimony agreements be reduced to writing and "made with the independent advice of counsel." She challenged N.J.S.A. 25:1-5(h) on constitutional grounds and urged enforcement as a typical contract; alternatively, she sought

1

enforcement of the agreement on equitable grounds. Lynch denied the existence of an oral palimony agreement and asserted that the written agreement was unenforceable because the parties did not receive the independent advice of counsel before entering it.

At trial, Moynihan testified that their relationship "was like a marriage," and that Lynch told her there was "no reason" to consult an attorney about their agreement and notarizing the agreement "makes it legal." Lynch diminished their relationship and gave conflicting testimony about whether he intended to be bound by the agreement.

The trial court found that N.J.S.A. 25:1-5(h)'s attorney-review requirement did not contravene Moynihan's constitutional rights. The court determined that the written agreement was not a palimony agreement but more akin to an "orderly removal" in a landlord/tenant matter and enforced the agreement. The court also found that the couple did not enter an enforceable oral palimony agreement. The Appellate Division reversed, but it upheld the finding that the parties did not reach an oral palimony agreement. The Court granted certification. 246 N.J. 324 (2021).

**HELD:** The palimony agreement, as written and signed, without the attorney review requirement, is enforceable. That portion of N.J.S.A. 25:1-5(h), which imposes an attorney-review requirement to enforce a palimony agreement, contravenes Article I, Paragraph 1 of the New Jersey Constitution. The parties did not enter an oral palimony agreement.

1. The Statute of Frauds generally requires that certain agreements be signed by the party against whom enforcement is sought. N.J.S.A. 25:1-5. In 2010, the Legislature amended the Statute to include palimony agreements. N.J.S.A. 25:1-5(h). Prior to the amendment, New Jersey's common law recognized that an unwed couple could enter into a palimony agreement and courts enforced oral palimony agreements involving "marital-type relationships" where one party induced the other to enter or remain in the relationship by a promise of support. The feature that distinguishes N.J.S.A. 25:1-5(h) from all other provisions of the Statute of Frauds is the requirement that each party to the palimony agreement secure the "independent advice of counsel." No other law in this state conditions enforceability of an agreement between private parties on attorney review. Furthermore, none of the jurisdictions that enforce palimony agreements mandate that the parties consult with attorneys before entering into such agreements. (pp. 22-25)

2. N.J.S.A. 25:1-5(h)'s attorney-review requirement does not violate the Contract Clauses of the United States and New Jersey Constitutions, which bar the state legislature from passing any law impairing the obligation of contracts. U.S. Const. art. I, § 10, cl. 1; N.J. Const. art. IV, § 7, ¶ 3. The essential aim of the Federal and State Contract Clauses is to restrain a state legislature from passing laws that retrospectively impair preexisting contracts. That concern is not present here; Moynihan and Lynch signed their written agreement well after the effective date of N.J.S.A. 25:1-5(h). (pp. 26-28)

2

3.  The question is whether, under the substantive due process guarantee of Article I, Paragraph 1 of the State Constitution, the State generally can impose on an individual the burden of retaining counsel to review a private contract.  The right to "personal liberty" guaranteed in Article I, Paragraph 1 protects against the government arbitrarily interfering with the right to individual "autonomy."  A.A. v. Att'y Gen., 384 N.J. Super. 67, 109 (App. Div. 2006) (quoting Doe v. Poritz, 142 N.J. 1, 78 (1995)), aff'd 189 N.J. 128 (2007).   The right of individuals to represent themselves in civil courts -- and presumably to craft their own private contracts -- predates the adoption of the Federal and State Constitutions.  The original Statute of Frauds did not require a person to consult with an attorney before entering into a contract.  Among the universe of private contracts, the Legislature mandates attorney review only for palimony agreements.  (pp. 28-34)

4.  In determining whether parties have a substantive due process liberty interest under Article I, Paragraph 1, the Court applies a balancing test weighing three factors:  "the nature of the right at stake, the extent to which the challenged statutory scheme restricts that right, and the public need for the statutory restriction."  Lewis v. Harris, 188 N.J. 415, 443 (2006).  Here, it is the right of personal autonomy -- the right to make decisions without the compelled participation of an attorney.  The attorney-review requirement of N.J.S.A. 25:1-5(h) directly infringes on that right.  An attorney's services may impose a cost that the parties do not want to bear or cannot afford.  Attorney review almost certainly will result in fewer palimony agreements.  The legislative history of N.J.S.A. 25:1-5(h) does not shed light on why only palimony agreements require attorney review. (pp. 34-37)

5.  The imposition of an attorney-review requirement is an arbitrary government restriction that contravenes Moynihan's substantive due process rights.  The Court strikes down the attorney-review requirement in N.J.S.A. 25:1-5(h).  Palimony agreements must still be in writing and signed, if not by both parties, at least by the party against whom the agreement is to be enforced -- just like all agreements enumerated in the Statute of Frauds.  The Court enforces the palimony agreement as written in this case.  (pp. 37-38)

6.  Sufficient credible evidence in the record supports the trial court's determination that Lynch did not make an explicit or implied oral promise to support Moynihan for life.  Therefore, the parties did not have an oral palimony agreement before 2010.  Because the written palimony agreement is enforceable, the Court does not address any of the equitable remedies pressed by Moynihan for enforcement of that agreement.  (pp. 38-40)

**REVERSED in part; AFFIRMED in part.  REMANDED to the trial court.**

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON, SOLOMON, and PIERRE-LOUIS join in JUSTICE ALBIN's opinion.**

3

Kathleen M. Moynihan,

Plaintiff-Appellant,

v.

Edward J. Lynch,

Defendant-Respondent.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|---|---|
| November 29, 2021 | March 8, 2022 |

Angelo Sarno argued the cause for appellant (Snyder Sarno D'Aneillo Maceri & Da Costa, attorneys; Angelo Sarno, of counsel and on the briefs, and Scott D. Danaher, on the briefs).

Allison M. Roberts argued the cause for respondent (AMR Law, attorneys; Allison M. Roberts, of counsel and on the briefs).

Robin C. Bogan argued the cause for amicus curiae New Jersey State Bar Association (New Jersey State Bar Association, attorneys; Domenick Carmagnola, President, of counsel, and Robin C. Bogan, Brian G. Paul, and Brian M. Schwartz, on the brief).

Jeralyn L. Lawrence argued the cause for amicus curiae The New Jersey Chapter of the American Academy of

Matrimonial Lawyers (Lawrence Law, attorneys; Jeralyn L. Lawrence, Bonnie C. Frost, Christine C. Fitzgerald, and Dina Mikulka, on the brief).

JUSTICE ALBIN delivered the opinion of the Court.

Kathleen Moynihan and Edward Lynch were involved in a long-term "marital-style relationship." Anticipating the potential dissolution of that relationship, they signed and notarized a written agreement that finalized the financial obligations each owed to the other. That palimony agreement provided that, within five years of vacating their jointly owned home, Lynch would pay off the mortgage, deed it over to Moynihan, pay her $100,000, and pay the real estate taxes on the property for two years after his departure.

The primary issue in this case is the validity of that written palimony agreement. After the relationship ended, Lynch contended that the agreement was unenforceable because neither he nor Moynihan had counsel review the agreement before signing it, as required by N.J.S.A. 25:1-5(h). That statute provides that a written promise in a palimony agreement is not "binding unless it was made with the independent advice of counsel for both parties." N.J.S.A. 25:1-5(h). Moynihan claims, among other things, that the provision compelling the parties to secure the assistance of counsel to enter into a

2

written palimony agreement violates the constitutional prohibition on impairing contracts.

The trial court found that N.J.S.A. 25:1-5(h)'s attorney-review requirement did not contravene Moynihan's constitutional rights. The court, however, determined that the written agreement was not a palimony agreement but more akin to an "orderly removal" in a landlord/tenant matter and enforced the agreement according to its terms. The court also found that the couple did not enter an enforceable oral palimony agreement.

The Appellate Division reversed. It concluded that the Lynch/Moynihan agreement was clearly a palimony agreement, pursuant to N.J.S.A. 25:1-5(h), and therefore unenforceable because the parties did not receive the "independent advice of counsel" before signing the agreement. The Appellate Division further determined that N.J.S.A. 25:1-5(h)'s attorney-review requirement did not violate the federal or state constitutional provision prohibiting the impairment of contracts. It upheld the trial court's finding that the parties did not reach an oral palimony agreement.

We agree with the Appellate Division that Lynch and Moynihan signed a written palimony agreement. We also find that N.J.S.A. 25:1-5(h) did not retrospectively alter a preexisting contract and therefore did not constitute legislation impairing a contract. We hold, however, that N.J.S.A. 25:1-5(h)'s

3

attorney-review requirement contravenes the substantive due process guarantee of Article I, Paragraph 1 of the New Jersey Constitution.

Article I, Paragraph 1 limits the power of the State to control individual decision-making in certain fundamental areas concerning a person's life and livelihood. N.J.S.A. 25:1-5(h) compels individuals to retain attorneys before they can enter a palimony agreement -- a contract no more complicated than other family law or commercial contracts that do not require attorney review. N.J.S.A. 25:1-5(h)'s attorney-review requirement interferes with an individual's right of autonomy, singles out written palimony agreements from among all other agreements for differential treatment, and has no parallel in the legislative history of this state.

The State generally cannot compel a person to accept counsel in a criminal or civil case. Because individuals generally have a constitutional right to represent themselves in our criminal and civil courts, it follows that generally they can enter a contract no more complex than others without an attorney. The attorney-review requirement also unduly burdens those who cannot afford counsel -- those with little or no income -- denying them the opportunity to enter contracts available to their more affluent counterparts. No sound reason has been given for the public need to compel attorney review of palimony agreements to the exclusion of all other agreements. We therefore

4

conclude that N.J.S.A. 25:1-5(h)'s provision compelling parties to seek the advice of counsel -- and therefore retain counsel -- before signing a palimony agreement violates the substantive due process guarantee of our State Constitution.

Although we reverse the judgment of the Appellate Division enforcing the written agreement, we affirm its judgment that sufficient credible evidence in the record supports the trial court's finding that the parties did not enter an oral palimony agreement. We remand for proceedings consistent with this opinion.

## I.

## A.

Kathleen Moynihan filed a complaint and an amended complaint in the Superior Court, Burlington County, seeking enforcement of a written palimony agreement, as well as an alleged oral palimony agreement that she claimed the parties had entered before the Legislature in 2010 amended N.J.S.A. 25:1-5 to include subparagraph (h). That amendment mandated that palimony agreements be reduced to writing and "made with the independent advice of counsel." N.J.S.A. 25:1-5(h). Additionally, Moynihan contended, her written agreement should be enforced as a typical contract, not as a palimony agreement. Alternatively, she urged that if the agreement constituted a written

5

or oral palimony agreement, it should be enforced on a number of equitable grounds, such as partial performance of the oral and written agreements, equitable estoppel, fraud, and specific performance of an implied contract.

In response, Lynch denied the existence of an oral palimony agreement and stated that the written agreement was unenforceable because the parties did not receive the independent advice of counsel before entering it, as required by N.J.S.A. 25:1-5(h). He also counterclaimed for partition of the home that he and Moynihan owned, asserting that the parties should equally split the proceeds of the sale.

A six-day trial was conducted in the Chancery Division, Family Part. The court heard testimony from Moynihan, her two daughters, and Lynch. Although the parties' testimony differed greatly on some points, we begin with those facts that are mostly undisputed.

1.

Moynihan and Lynch first met in 1997 when Moynihan served as a flight attendant and Lynch worked as a pilot for U.S. Airways. In time, they developed a romantic relationship. At the beginning of their relationship, Moynihan was in the midst of divorce proceedings and lived in Mansfield with her three children. Lynch had a home in New Hampshire and an apartment in

Philadelphia and split his time between the two. In the early part of their relationship, Lynch occasionally slept over at Moynihan's home.

In 2000, Moynihan and her estranged husband divorced. Because Moynihan's ex-husband stopped making mortgage payments on the family home, a foreclosure action followed. Moynihan then moved with her children to a home in Bordentown. Although Moynihan borrowed $8,000 from her father to make a down payment on the home, Lynch primarily financed the purchase through a mortgage, and the home was deeded in his name.

Lynch stayed with greater frequency at the Bordentown home and would regularly dine with Moynihan and her children. He also became more active in the life of the Moynihan family. He frequently attended Moynihan's children's after-school activities and spent a number of holidays with the family. By all appearances, Lynch and Moynihan had more than a dating relationship. During their relationship, they discussed marriage, though they never wed.

Moynihan and Lynch shared the financial responsibilities in maintaining the home: Moynihan initially paid the monthly mortgage and real estate taxes, along with other household expenses, while Lynch paid for the home's improvements. Over time, Lynch began to provide Moynihan with approximately $1,000 a month to pay the mortgage and other expenses. In

2007, Lynch placed the title of the home into a revocable trust and named

Moynihan as the trust's beneficiary upon his death.  Lynch also named

Moynihan as the beneficiary of his life insurance policy, his 401(k) plan, and

his bond account.

Sometime between 2012 and 2014, the parties entered into a prospective

property settlement agreement in the event their relationship dissolved.  The

handwritten agreement drafted by Lynch provided:

> In the event that Kathleen Moynihan and Edward Lynch terminate their relationship I agree to the following terms:
>
> 1. The home . . . in Bordentown NJ will be paid off within five years after Mr. Lynch vacates the property.
>
> 2. After paying off the mortgage note Mr. Lynch will sign the deed over to Ms. Moynihan there giving her sole ownership of said property.
>
> 3. Until the mortgage is satisfied Mr. Lynch will pay the monthly mortgage payment.
>
> 4. Mr. Lynch will pay the property tax [on the Bordentown home] for two years after his departure.
>
> 5. Mr. Lynch will pay Kathleen Moynihan a sum of $100,000. dollars by the end of a five year period starting when Mr. Lynch vacates the [Bordentown home].
>
> This agreement finalizes all obligations of Mr. Lynch to Ms. Moynihan.

8

Moynihan and Lynch signed the agreement and had it notarized without consulting attorneys.

In 2013, Lynch sold his New Hampshire home and seemingly began to live full-time with Moynihan. He also converted his sole ownership of the Bordentown home into a joint tenancy with rights of survivorship, naming himself and Moynihan on the deed. Although Moynihan and Lynch had tentative plans to retire together, uncertainty about their financial future plagued the latter part of their relationship. To allay Moynihan's concerns about Lynch's commitment to her, in March 2014, Lynch texted, "I do love you and all I do is planning for your future but you don't seem to realize that."

In 2015, the bottom fell out of their relationship, and Lynch and Moynihan parted ways. Lynch moved to Florida and continued to pay the mortgage on the Bordentown home and, until 2016, the real estate taxes for the home, but otherwise refused to abide by their written settlement agreement.

2.

Beyond that spare narrative, Moynihan and Lynch gave very different accounts of their personal and financial relationship.

At the trial, Moynihan testified that her relationship with Lynch "was like a marriage" and that, along with her children, they were akin to a family. Moynihan's daughters, Megan and Caitlin, viewed Lynch as a "stepfather" and

9

a member of their household.  Caitlin recalled that Lynch slept over at the Bordentown home "[n]inety percent" of the time.

Moynihan stated that Lynch expressed his love for her and his intent to financially support her family.  According to Moynihan, Lynch purchased the Bordentown home because he did not want her family to live in an apartment.  When Moynihan's ex-husband moved to terminate alimony in 2011, Lynch not only hired an attorney to respond to the motion, but also assured her that she did not need the alimony because "he would take care of [her] for the rest of [her] life."[1]  After Moynihan voluntarily surrendered her alimony, Lynch began to pay the mortgage, real estate taxes, and homeowner's insurance on the home.

Moynihan also described the backdrop to the written settlement that she and Lynch signed.  On an unremarkable day in 2012, while the two were sitting in the family room of the Bordentown home, Lynch broached the subject of what he would do for her if their relationship ended and suddenly presented the written agreement.  The conversation came as a surprise to Moynihan, and she felt betrayed by his past promises that they would have a life together.  When Moynihan asked, "maybe we should go to a lawyer,"

---

[1]  By consent, Moynihan accepted the termination of alimony in exchange for a lump-sum payment of $40,414 by her ex-husband.

Lynch responded that there was "no reason" to see a lawyer: "[I]f I tell you I'm going to do something, I'm going to do it. I'm a man of my word." Lynch further assured her that "getting [the document] notarized is as good as going to an attorney. It makes it legal." Moynihan admitted that she signed the agreement freely and voluntarily in the presence of a notary.

Afterwards, their relationship deteriorated. Although the couple often talked about marriage, Lynch consistently found excuses for not going forward. At some point, Moynihan realized that they "weren't looking for the same thing," and they went their separate ways.

3.

In his testimony, Lynch offered a different view of his personal and financial relationship with Moynihan. Lynch admitted that he "lived a good portion of the time in New Jersey" with Moynihan, dined with the Moynihans as a family, attended the children's athletic activities, and spent some holidays with them.[2] Lynch, however, declined to describe his eighteen-year relationship with Moynihan as a marital-like relationship; instead, he referred to it as "a relationship that worked for us at the time."

---

[2] Lynch also shared holidays with his own daughter, who attended a boarding school.

Lynch stated that he purchased the Bordentown property not just to house Moynihan and her children, but also as a financial investment -- as a rental property -- and claimed that he had a "rental agreement" with Moynihan. He denied that he moved into the family home, but contended that he began to pay the mortgage and real estate taxes on the home starting around 2004. Before the termination of Moynihan's alimony, he stated that the two did not discuss marriage, and afterwards he did not remember having any "strong conversations about marriage" with her; he said it could have happened but "it's not ringing a bell with me."

Lynch explained that he did not cheerfully name Moynihan as the beneficiary of his life insurance policy or the trust into which he had placed the home. According to Lynch, Moynihan badgered him and insisted that he do so, and he placated her "to keep calm in the house." Lynch, moreover, denied that he ever promised to support Moynihan for life; instead, he told her that if they retired together, they would be "all right" based on their aggregate finances.

Lynch recalled signing the written settlement agreement in 2014. When asked whether he intended to be bound by the agreement, he gave varied responses: "[n]ot really but -- no"; "I assumed we were negotiating onward"; and finally, "I expected to be bound. . . . [W]e had an agreement." He

12

conceded that he knew that Moynihan felt financially insecure and that his objective in signing the agreement was to "shut her up."

### B.

The trial court found Moynihan's "testimony to be much more credible than . . . [Lynch's] testimony in all respects." The court credited the testimony that the parties had a "marital-style and a family-style relationship." The court reached that conclusion because Lynch cohabited with Moynihan for approximately fifteen years, dined with her and her children regularly, went on vacations with the Moynihans as a family, and attended the children's athletic activities. Nevertheless, because of the parties' failure to comply with the attorney-review requirement of N.J.S.A. 25:1-5(h), the trial court dismissed Moynihan's claim that she had an enforceable written palimony agreement.

The court rejected Moynihan's argument that N.J.S.A. 25:1-5(h)'s attorney-review requirement violated the Federal Constitution. The court also determined that Moynihan did not have a viable oral palimony agreement before passage of N.J.S.A. 25:1-5(h) because Moynihan failed to prove that between 1997 and 2010 Lynch made any "express or implied promises to support [her] for life."[3]

---

[3] In Maeker v. Ross, we held that the 2010 amendment to the Statute of Frauds, N.J.S.A. 25:1-5(h), which included the attorney-review provision, applies prospectively. 219 N.J. 565, 581-82 (2014). Thus, to prevail on her

13

The court found, however, that Moynihan had an enforceable written contract despite her palimony claims -- an agreement that represented "the final expression of the discussions that the parties had over the years concerning their financial futures." It concluded that Lynch had handwritten the agreement, the parties read and understood the agreement before signing it in the presence of a notary in 2014, and therefore the agreement was a legally enforceable contract.

The court also determined that the contract was supported by consideration: Moynihan surrendered her alimony based on Lynch's representation that he would take care of her, inducing "her to remain in the relationship"; she borrowed $8,000 from her father to pay the down payment on the Bordentown home; and she rendered "[seventeen] years of payments to the home, making a home, taking care of things, and the love and affection that goes on with that."

According to the court, the written contract resolved the question about "the distribution of property." The court compared the dissolution of the Moynihan/Lynch relationship to an orderly removal in a landlord/tenant case. In its view, the written agreement constituted "the orderly breakup of the

_____

claim, Moynihan needed to show that Lynch made an oral promise to support her for life before 2010. See ibid.

14

relationship" setting forth the parties' responsibilities and the "distribution of monies." The court enforced the written agreement according to its terms.[4]

Both Lynch and Moynihan appealed.

## C.

The Appellate Division concluded that the written agreement signed by Lynch and Moynihan constituted a palimony agreement under the terms of N.J.S.A. 25:1-5(h): the couple were in a non-marital relationship, the agreement was in writing, and Lynch promised "to provide support or other consideration" to Moynihan. The Appellate Division determined, however, that the agreement was unenforceable because the parties failed to comply with the attorney-review requirement of N.J.S.A. 25:1-5(h). It noted that the promise of support for life -- an essential feature of a palimony agreement under the common law -- is not an element of N.J.S.A. 25:1-5(h), as the trial court believed. The trial court erred, according to the Appellate Division, by finding that the written agreement signed by Lynch and Moynihan was a non-palimony agreement that fell outside the ambit of the attorney-review requirement of N.J.S.A. 25:1-5(h).

---

[4]  The court maintained the temporary restraints it had earlier placed on Lynch's ability to remove funds from his bank account -- funds that might be necessary to satisfy the judgment in favor of Moynihan.

15

The Appellate Division rejected Moynihan's argument that N.J.S.A. 25:1-5(h)'s attorney-review requirement constituted a "Law impairing the Obligation of Contracts" in violation of the United States and New Jersey Constitutions. See U.S. Const. art. 1, § 10, cl. 1; N.J. Const. art. IV, § 7, ¶ 3. It upheld the constitutionality of N.J.S.A. 25:1-5(h) because mandating attorney review of palimony agreements (1) does not equate to a substantial impairment of a contract, (2) "reasonably relate[s] to a significant and legitimate public purpose," and (3) advances an "appropriate legislative objective[]" -- protecting the rights of the parties entering into palimony agreements, citing Burgos v. State, 222 N.J. 175, 193-94 (2015).

The Appellate Division also rejected Moynihan's claims for equitable relief, including partial performance and specific performance, on the ground that Moynihan did not satisfy the traditional elements necessary for such relief. It further found that accepting Moynihan's partial performance claim, based on an alleged "oral agreement between the parties, would essentially permit enforcement of [a] contract the Legislature has expressly prohibited."

Additionally, the Appellate Division dismissed Moynihan's claim of a pre-2010 oral palimony agreement. It credited the trial court's finding that, before 2010, Lynch did not make an express or implied oral promise to support Moynihan for life.

16

Last, the Appellate Division reinstated Lynch's counterclaim for partition of the Bordentown home and remanded to the trial court for consideration of that issue.[5]

We granted Moynihan's petition for certification. 246 N.J. 324 (2021). We also granted the motions of the New Jersey State Bar Association and the New Jersey Chapter of the American Academy of Matrimonial Lawyers to participate as amici curiae.

## II.

## A.

## 1.

Moynihan argues that the attorney-review requirement violates the Contract Clauses of the Federal and State Constitutions.[6] See U.S. Const. art. I, § 10, cl. 1; N.J. Const. art. IV, § 7, ¶ 3; Farmers Mut. Fire Ins. Co. of Salem v. N.J. Prop.-Liab. Ins. Guar. Ass'n, 215 N.J. 522, 546-47 (2013). She asserts that the attorney-review requirement substantially impairs a contractual relationship because, unlike "every other agreement in a family law setting,"

---

[5] In light of its dismissal of Moynihan's claims, the Appellate Division vacated the trial court's order freezing Lynch's bank account.

[6] Moynihan states in her petition that she put the Attorney General "on notice during the pendency of both the trial court and Appellate Division cases" of her challenge to the constitutionality of N.J.S.A. 25:1-5(h), as is required by Rule 4:28-4(a)(1).

17

two willing and informed individuals cannot enter a palimony agreement "without the independent advice of counsel for both parties." She notes that those who choose to sign a palimony agreement do not have the option to waive the participation of counsel -- a right conferred even on defendants in criminal trials -- and that the attorney-review requirement will make palimony agreements unavailable to the class of individuals unable to afford counsel.

Because the writing and signing requirements of N.J.S.A. 25:1-5(h) fulfill the general purpose of the Statute of Frauds -- prescribing reliable methods for proving an authentic contract -- Moynihan contends that the attorney-review requirement lacks a significant and legitimate public purpose and is unrelated to an appropriate governmental objective. She posits that there is no logical explanation for imposing an attorney-review requirement for palimony agreements but not for other agreements.

Apart from her constitutional argument, Moynihan submits that Lynch cannot invoke the Statute of Frauds for the purpose of accomplishing a fraud, citing Cauco v. Galante, 6 N.J. 128, 138 (1951). She claims that she relied on Lynch's oral and written promises during an eighteen-year marital-type relationship and performed her part of the agreement -- dedicating her life to him, maintaining a home for him, and surrendering her alimony as he wished. That partial performance of her end of the agreement, Moynihan declares,

18

constitutes the traditional equitable exception to the Statute of Frauds recognized in our case law. She therefore urges the enforcement of the written agreement.

Last, Moynihan urges this Court to reverse the trial court's determination that she and Lynch did not enter into a valid oral palimony agreement prior to 2010.

2.

Amici the New Jersey State Bar Association and the New Jersey Chapter of the American Academy of Matrimonial Lawyers echo many of the arguments advanced by Moynihan. Both urge us to signal that courts retain their equitable powers to ensure that the Statute of Frauds does not become an instrument to perpetrate a fraud and to confirm that promissory estoppel and partial performance remain valid defenses to prevent an injustice by an inflexible adherence to the writing or attorney-review requirements of N.J.S.A. 25:1-5(h).

Additionally, the Bar Association asserts that the attorney-review requirement violates the prohibitions against the impairment of contracts and the equal protection guarantees of the Federal and State Constitutions. The Bar Association submits that no rational basis supports subjecting palimony agreements to attorney review while exempting similar agreements made

19

between "[t]wo individuals in a non-dating relationship, such as two business partners, or friends, or siblings."

Although the Academy of Matrimonial Lawyers confines its arguments to the realm of equity, it likewise focuses on the disparate impact that the attorney-review requirement will have on "[f]inancially dependent partners who are often unable to afford legal counsel" and notes that "'self-represented litigants comprise the majority of those filing in the Non-Dissolution docket,'" quoting Admin. Off. of the Cts., Directive No. 08-11: Family -- Non-Dissolution Matters (FD Docket) -- Revised Procedures 1 (Sept. 2, 2011) (alteration omitted). The Academy also points out that, even in the case of the termination of a parent's custody of a child, a litigant may waive the right to counsel.

B.

Lynch urges the Court to affirm the judgment of the Appellate Division, mostly for the reasons stated in its opinion. Lynch submits that the 2010 amendment to the Statute of Frauds, N.J.S.A. 25:1-5(h), which mandated that palimony agreements be in writing, signed, and subject to attorney review, did not violate the constitutional rights of Moynihan, who should have known the requirements of the law when entering into the 2014 written palimony agreement. In his view, the attorney-review requirement did not substantially

20

impair Moynihan's right to contract because she had the funds to secure counsel. According to Lynch, Moynihan cannot complain that the law applies unequally to her.

He further claims that the attorney-review requirement serves "a significant and legitimate public purpose" related to "appropriate governmental objectives" -- to safeguard those who enter into palimony agreements from fraud, human frailty, and unreliable methods of proof, quoting Borough of Seaside Park v. Comm'r of State Dep't of Educ., 432 N.J. Super. 167, 216 (App. Div. 2013). Simply put, Lynch maintains that "a person's choice not to pay, retain or otherwise be involved with counsel is not a protected right."

Additionally, Lynch asserts that the equitable remedies Moynihan seeks to apply to this case would render meaningless the plain language of N.J.S.A. 25:1-5(h), a statute intended to supplant this Court's palimony decisions. Last, he asks that the Court defer to the trial court's factfindings that, before 2010, Lynch never promised to support Moynihan for life, a requisite condition to a palimony agreement under the common law.

III.

A.

Moynihan's primary argument is that the attorney-review requirement of N.J.S.A. 25:1-5(h) essentially compels parties entering a palimony agreement to retain counsel and that forcing counsel on unwilling parties is unconstitutional. A brief history of N.J.S.A. 25:1-5(h) will frame the issue before us.

The Statute of Frauds generally requires that certain agreements "be in writing, and signed by the party to be charged therewith" -- that is, signed by the party against whom enforcement is sought. N.J.S.A. 25:1-5. The underlying concern of the Statute of Frauds is "that certain [oral] agreements may be 'susceptible to fraudulent and unreliable methods of proof,'" and for that reason the Statute mandates "that those agreements be reduced to writing and signed." Maeker v. Ross, 219 N.J. 565, 578 (2014) (quoting Lahue v. Pio Costa, 263 N.J. Super. 575, 599 (App. Div. 1993)).

In 2010, the Legislature amended the Statute of Frauds to include palimony agreements. See L. 2009, c. 311, § 1 (codified as N.J.S.A. 25:1-5(h)). The new law stated that the Statute of Frauds' writing and signing requirements applied to

> [a] promise by one party to a non-marital personal relationship to provide support or other consideration

22

for the other party, either during the course of such relationship or after its termination. For the purposes of this subsection, no such written promise is binding unless it was made with the independent advice of counsel for both parties.

[N.J.S.A. 25:1-5(h).]

The requirement "that a palimony agreement be in writing and signed and that the parties have 'the independent advice of counsel'" represented "a sea change in the law." Maeker, 219 N.J. at 576 (quoting N.J.S.A. 25:1-5(h)).

Prior to the 2010 amendment, New Jersey's common law recognized that an unwed couple in a "marital-type relationship" could enter into a palimony agreement -- an agreement in which one party expressly or impliedly promises to support the other party, generally for life, in return for consideration given by the other party, such as remaining in the relationship. See Devaney v. L'Esperance, 195 N.J. 247, 253-55, 257 (2008); In re Estate of Roccamonte, 174 N.J. 381, 389-90, 392-93 (2002). Under the common law, our courts enforced oral palimony agreements involving "marital-type relationships" where one party induced the other to enter or remain in the relationship by a promise of support. Maeker, 219 N.J. at 576 (citing Kozlowski v. Kozlowski, 80 N.J. 378, 387 (1979)).

The purpose of the 2010 amendment to the Statute of Frauds, as expressed in the legislative history leading to the enactment of N.J.S.A. 25:1-

5(h), was to "overturn recent 'palimony' decisions by New Jersey courts [such as <u>Devaney</u> and <u>Roccamonte</u>] by requiring that any such contract must be <u>in writing and signed</u> by the person making the promise." <u>Maeker</u>, 219 N.J. at 577-78 (quoting <u>A. Judiciary Comm. Statement to S. 2091</u> (Dec. 3, 2009); <u>S. Judiciary Comm. Statement to S. 2091</u> (Feb. 9, 2009) (emphasis added)). Additionally, the amendment provided that "no such written promise is binding unless it was made with the independent advice of counsel for both parties." <u>A. Judiciary Comm. Statement to S. 2091</u>; <u>accord</u> <u>S. Judiciary Comm. Statement to S. 2091</u>.

The feature that distinguishes N.J.S.A. 25:1-5(h) from all other provisions of the Statute of Frauds is the requirement that each party to the palimony agreement secure the "independent advice of counsel." That feature raised a serious concern for Governor Corzine, who signed the amendment into law on January 18, 2010, the last day of the legislative session and his last full day in office. <u>See</u> <u>Governor's Statement on Signing S. 2091</u> (Jan. 18, 2010). In his signing statement, Governor Corzine expressed his dissatisfaction with the provision "mandating the involvement or services of an attorney." <u>Ibid.</u> He noted that the "[l]egislative leadership and the sponsors share my goal of . . . ensuring that this law does not have an adverse impact on parties who may not be able to afford the services of an attorney." <u>Ibid.</u> "[I]n light of the

24

representation by legislative leadership and the bill sponsors that this law will be improved" and "in light of the time constraints that result at the end of a legislative session, which do not afford time for a Conditional Veto to recommend removal of this provision," the Governor signed the bill into law. Ibid.

The Legislature never revisited the attorney-review requirement. No bill was introduced to address the concern raised by Governor Corzine.

Notably, no other law in this state conditions enforceability of an agreement between private parties on attorney review. Furthermore, none of the jurisdictions that enforce palimony agreements mandate that the parties consult with attorneys before entering into such agreements.[7]

---

[7] See Levar v. Elkins, 604 P.2d 602, 603-04 (Alaska 1980); Carroll v. Lee, 712 P.2d 923, 927 (Ariz. 1986); Marvin v. Marvin, 557 P.2d 106, 113 (Cal. 1976); Salzman v. Bachrach, 996 P.2d 1263, 1267-69 (Colo. 2000); Boland v. Catalano, 521 A.2d 142, 146 (Conn. 1987); Mason v. Rostad, 476 A.2d 662, 665-66 (D.C. 1984); Poe v. Estate of Levy, 411 So. 2d 253, 255-56 (Fla. Dist. Ct. App. 1982); Glasgo v. Glasgo, 410 N.E.2d 1325, 1327-31 (Ind. Ct. App. 1980); Wilcox v. Trautz, 693 N.E.2d 141, 145-46 (Mass. 1998); Att'y Grievance Comm'n of Md. v. Ficker, 572 A.2d 501, 507-09 (Md. 1990); Minn. Stat. § 513.075; Hudson v. DeLonjay, 732 S.W.2d 922, 926-27 (Mo. Ct. App. 1987); Kinkenon v. Hue, 301 N.W.2d 77, 80 (Neb. 1981); Hay v. Hay, 678 P.2d 672, 674 (Nev. 1984); Joan S. v. John S., 427 A.2d 498, 500 (N.H. 1981); Suggs v. Norris, 364 S.E.2d 159, 162 (N.C. Ct. App. 1988); Morone v. Morone, 413 N.E.2d 1154, 1155-57 (N.Y. 1980); Beal v. Beal, 577 P.2d 507, 510 (Or. 1978); Mullen v. Suchko, 421 A.2d 310, 311-12 (Pa. Super. Ct. 1980); Doe v. Burkland, 808 A.2d 1090, 1093-94 (R.I. 2002); Tex. Bus. & Com. Code Ann. § 26.01; Watts v. Watts, 405 N.W.2d 303, 313 (Wis. 1987); Kinnison v. Kinnison, 627 P.2d 594, 595-96 (Wyo. 1981).

We do not agree with the arguments made by Moynihan and the State Bar Association that N.J.S.A. 25:1-5(h)'s attorney-review requirement violates the Contract Clauses of the United States and New Jersey Constitutions. Both the Federal and State Constitutions bar the state legislature from passing any law impairing the obligation of contracts. U.S. Const. art. I, § 10, cl. 1 ("No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ."); N.J. Const. art. IV, § 7, ¶ 3 ("The Legislature shall not pass any . . . law impairing the obligation of contracts, or depriving a party of any remedy for enforcing a contract which existed when the contract was made.").

The essential aim of the Federal and State Contract Clauses is to restrain a state legislature from passing laws that retrospectively impair preexisting contracts. See Cleveland & P.R. Co. v. City of Cleveland, 235 U.S. 50, 53-54 (1914) ("It is equally well settled that an impairment of the obligation of the contract, within the meaning of the Federal Constitution, must be by subsequent legislation."); Berg v. Christie, 225 N.J. 245, 259 (2016) ("Contract impairment claims brought under either constitutional provision entail an analysis that first examines whether a change in state law results in the substantial impairment of a contractual relationship . . . ."). The Contract Clause was incorporated into the Federal "Constitution to remedy a particular

social evil" after the Revolutionary War -- "the state legislative practice of enacting laws to relieve individuals of their obligations under certain contracts." See Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 503 n.30 (1987) (quoting Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 256 (1978) (Brennan, J., dissenting)); see also Sveen v. Melin, 584 U.S. ___, 138 S. Ct. 1815, 1821 (2018).

A law that retroactively applies to a contract previously entered into by parties may upend the parties' reasonable expectations. See Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co., 459 U.S. 400, 411 (1983) (discussing the role that parties' reasonable expectations play in Contract Clause analysis). That concern about legislation reaching back to alter an already-existing contract and causing fundamental unfairness is not present here.

N.J.S.A. 25:1-5(h) went into effect in January 2010. See L. 2009, c. 311, § 1 (eff. Jan. 18, 2010). Moynihan and Lynch signed their written agreement, without consulting attorneys, well after the effective date of the statute -- by Moynihan's account in 2012 and Lynch's account in 2014. Both are presumed, like all persons, to know the law and its requirements. See Paragon Contractors, Inc. v. Peachtree Condo. Ass'n, 202 N.J. 415, 424-25 (2010) ("[P]arties are presumed to know the law and are obliged to follow it.") (citing Emanuel v. McNell, 87 N.J.L. 499, 504 (E. & A. 1915)).

In short, any constitutional infirmity in the attorney-review requirement of N.J.S.A. 25:1-5(h) cannot be ascribed to a violation of the Contract Clause.

C.

A different constitutional issue is raised, however, by a statute's mandate that the parties to a private contract secure counsel as a precondition to the enforcement of the contract. This case raises the question whether, under the substantive due process guarantee of Article I, Paragraph 1 of our State Constitution, the State generally can impose on an individual the burden of retaining counsel to review a private contract -- even against the individual's wishes and without regard to the individual's means to do so.[8]

"The right of individuals . . . to govern and manage their own affairs . . . is an implicit guarantee of the New Jersey Constitution." S.T. v. 1515 Broad Street, LLC, 241 N.J. 257, 274 (2020). Article I, Paragraph 1 provides that "[a]ll persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness." The right to "personal liberty" guaranteed in

---

[8] The broad language of Article I, Paragraph 1 incorporates the principle of substantive due process. See Jamgochian v. State Parole Bd., 196 N.J. 222, 239 (2008) (construing "the expansive language of Article I, Paragraph 1 to embrace the fundamental guarantee of due process" (citing Doe v. Poritz, 142 N.J. 1, 99 (1995))).

28

Article I, Paragraph 1 of our State Constitution protects against the government arbitrarily interfering with the right to individual "autonomy." A.A. v. Att'y Gen., 384 N.J. Super. 67, 109 (App. Div. 2006) (quoting Doe v. Poritz, 142 N.J. 1, 78 (1995)), aff'd 189 N.J. 128 (2007).

The right to personal autonomy plays a preeminent role in our constitutional system -- "competent people ordinarily can choose what they want." See In re M.R., 135 N.J. 155, 166-67 (1994). An individual has the "right to determine how best to pursue her personal and financial affairs" without the interference of an attorney. See S.T., 241 N.J. at 261 (citing M.R., 135 N.J. at 166).

The right of individuals to represent themselves in our civil courts -- and presumably to craft their own private contracts -- predates the adoption of our Federal and State Constitutions. "The practice of pro se representation by civil litigants finds its genesis in the English common law, which long respected a competent civil litigant's prerogative to decide whether he or she would seek the assistance of counsel." In re Civ. Commitment of D.Y., 218 N.J. 359, 374 (2014) (footnote omitted). Before the founding of our Republic and even before the provinces of West and East New Jersey were unified into a single colony, New Jersey residents were permitted to plead their causes, without counsel, in both civil and criminal cases. Id. at 375. In the Province of West

29

New Jersey, the law provided "[t]hat [in] the trials of all causes, civil and criminal, . . . no person or persons shall be compelled to fee any attorney . . . but that all persons shall have free liberty to plead his own cause if he please." Ibid. (alterations and omissions in original) (quoting The Concessions and Agreements of the Proprietors, Freeholders and Inhabitants of the Province of West New-Jersey, in America, ch. XXII (1677), available at http://westjersey.org/ca77.htm#chap22). Similarly, in the Province of East New Jersey, the law provided that "in all courts persons of all perswasions may freely appear in their own way, and according to their own manner, and there personally plead their own causes themselves." Ibid. (quoting The Fundamental Constitutions for the Province of East New Jersey in America, ch. XIX (1683), available at http://avalon.law.yale.edu/17th_century/nj10.asp).

Litigants today, as they did in our colonial past, "frequently represent themselves in New Jersey," id. at 376, and have the statutory right to do so, N.J.S.A. 2A:15-1 (stating that every competent and of-age person "may prosecute or defend any action in any court, in person or through another duly admitted to the practice of law in this State" (emphasis added)).

In criminal cases, the source of the right of self-representation is the Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of our State Constitution, but the rationale for that right is grounded in the

notion of personal autonomy. Thus, "[t]he right to appear pro se exists to affirm the dignity and autonomy of the accused," McKaskle v. Wiggins, 465 U.S. 168, 176-77 (1984), and "his choice must be honored out of 'that respect for the individual which is the lifeblood of the law,'" Faretta v. California, 422 U.S. 806, 834 (1975) (quoting Illinois v. Allen, 397 U.S. 337, 350-51 (1970) (Brennan, J., concurring)).[9] See also State v. Reddish, 181 N.J. 553, 585 (2004) (noting that the right of self-representation "is about respecting a defendant's capacity to make choices for himself, whether to his benefit or to his detriment").

The historical absence of cases addressing whether the State could force parties to a contract to retain attorneys is telling. We know that in colonial times litigants had a right to represent themselves in court to plead the enforcement of a contract, and we know of no law that compelled them to retain an attorney to draft a contract. Denying competent parties the ability to contract on their own without the compelled participation of attorneys would seemingly have been a notion alien to the founders of our Republic and our State.

---

[9] An accused's right of self-representation is not absolute. For example, a defendant must provide an appropriate waiver of the right to counsel, and a trial court retains the authority "to terminate self-representation if the defendant engages in 'serious and obstructionist misconduct.'" See State v. Davenport, 177 N.J. 288, 300 (2003) (quoting Faretta, 422 U.S. at 834 n.46).

31

The original Statute of Frauds, passed in England in 1677 and from which N.J.S.A. 25:1-5 is derived, did not require a person to consult with an attorney before entering into a contract. See An Act for Prevention of Frauds and Perjuryes, 29 Car. 2, c. 3, § 4 (1677), available at https://www.british-history.ac.uk/statutes-realm/vol5/pp839-842; see also Maeker, 219 N.J. at 578-79 (discussing the history of the Statute of Frauds). Indeed, when the New Jersey Legislature passed its own "Act for the Prevention of Frauds and Perjuries" in 1794, it did not require parties to consult with an attorney in order to make an enforceable contract. See L. 19, c. 496, §§ 1 to 15 (1794). New Jersey's present-day Statute of Frauds has but one exception -- the attorney-review requirement for palimony agreements.

Of all the agreements in a family law setting, only a palimony agreement requires that, for its enforcement, the parties must have secured the independent advice of counsel. Without the advice or participation of attorneys, a married couple in a divorce action can reach an agreement on custody and parenting time, child support and alimony, equitable distribution, and other important issues. See N.J.S.A. 2A:34-23.1(e). Even premarital agreements under the Uniform Premarital and Pre-Civil Union Agreement Act permit the parties to "voluntarily and expressly waive, in writing, the

32

opportunity to consult with independent legal counsel." N.J.S.A. 37:2-38(c)(4).

In a myriad of other settings, parties remain free to enter into contracts without consulting or retaining attorneys, such as when purchasing real estate, see N.J.S.A. 46:14-2.1;[10] entering a commercial transaction to buy goods, see N.J.S.A. 12A:2-201; engaging in a consumer transaction, see N.J.S.A. 56:12-2; creating a will, see N.J.S.A. 3B:3-2; or securing life or health insurance, see N.J.S.A. 17B:25-18.2.

Among the universe of private contracts, the Legislature mandates attorney review only for palimony agreements.

Lynch's comparison of the attorney-review provision in N.J.S.A. 25:1-5(h) to the attorney-review provision for assigning prizes under the State Lottery Law is inapt. See N.J.S.A. 5:9-1 to -25. Under the State Lottery Law, the Legislature has decreed that any person who has won a lottery prize may not assign the winnings unless a number of conditions are met, including "that the winner has retained, and consulted with, independent legal counsel" and "that the winner has retained, and consulted with, an independent tax advisor." N.J.S.A. 5:9-13(d)(15), (16) (emphasis added).

---

[10]  New Jersey regulations afford buyers of residential real estate the opportunity to have attorneys review their contracts but do not require such review in order to make those contracts enforceable. See N.J.A.C. 11:5-6.2(g).

33

Unlike the case before us, the State Lottery involves the disposition of government-raised funds. The attorney-review provision in the State Lottery Law is part of a highly regulated scheme "operated by the State [with] the entire net proceeds . . . to be used for State institutions and State aid for education" pursuant to the New Jersey Constitution. See N.J.S.A. 5:9-2; see also N.J.S.A. 5:9-1 to -25 (setting forth the comprehensive regulatory scheme of the State Lottery Law). The assignment of lottery prizes is subject to judicial scrutiny to prevent exploitation of the winner and to assure that the winner complies with any enumerated debt obligations, such as a default on child support or student loan payments. N.J.S.A. 5:9-13(d)(17), (18); N.J.S.A. 5:9-13.5; N.J.S.A. 5:9-13.14. A lottery prize may not be assigned without a judicial order that contains eighteen findings, including a finding of attorney review. N.J.S.A. 5:9-13(d). Last, the lottery winner has state-provided prize monies to retain an attorney and accountant.

The constitutionality of the attorney-review requirement governing palimony agreements does not rise or fall on comparisons to the State Lottery Law.

IV.

The ultimate issue is whether, under Article I, Paragraph 1 of our State Constitution, parties to written palimony agreements have a substantive due

34

process liberty interest in crafting and entering such agreements without the forced involvement of attorneys. The broad language of Article I, Paragraph 1 reflects, in part, "a 'general recognition of those absolute rights of the citizen which were a part of the common law.'" King v. S. Jersey Nat'l Bank, 66 N.J. 161, 178 (1974) (quoting Ransom v. Black, 54 N.J.L. 446, 448 (Sup. Ct. 1892), aff'd, 65 N.J.L. 688 (E. & A. 1900)). As discussed earlier, the right to plead one's case in court without an attorney preceded the adoption of New Jersey's first Constitution in 1776.

In determining whether parties have a particular liberty interest -- here, to enter a written palimony agreement without a compelled attorney review -- our Court applies a balancing test weighing three factors: "the nature of the right at stake, the extent to which the challenged statutory scheme restricts that right, and the public need for the statutory restriction." Lewis v. Harris, 188 N.J. 415, 443 (2006) (citing Greenberg v. Kimmelman, 99 N.J. 552, 567 (1985)).

We have discussed in detail the nature of that right and its historical backdrop. It is the right of personal autonomy, the right to make decisions on one's own -- whether enlightened or foolish -- without the compelled participation of an attorney. To be clear, we recognize the benefit and guidance that attorneys would provide in reviewing or crafting a palimony

35

agreement or any other agreement. The guiding hand of counsel may be critical in a criminal trial, yet an accused has the right to represent himself, to make choices on his own that may bear on his freedom, given the preeminent role of individual autonomy in our constitutional system. See McKaskle, 465 U.S. at 176-77. So too, attorneys will be better able to draft palimony agreements and other contracts, but individuals are free to do so on their own without consulting or retaining attorneys.

The attorney-review requirement of N.J.S.A. 25:1-5(h) directly infringes on the right of parties to enter a palimony agreement without retaining an attorney. We cannot pretend that requiring attorney review means something other than that individuals will have to pay for the services of an attorney, who will then have the obligation to engage in a due-diligence examination of all the circumstances bearing on the fairness of the agreement. See RPC 1.3 (providing that an attorney must act with "reasonable diligence" when representing a client); Ziegelheim v. Apollo, 128 N.J. 250, 260-61 (1992) (same). An attorney's services may impose a cost that the parties do not want to bear or cannot afford. As the Academy of Matrimonial Lawyers has pointed out, the majority of filings in the non-dissolution docket are by self-represented litigants, see Directive No. 08-11, and parties to palimony agreements fall within that docket. We cannot ignore the potential disparate

36

impact of the statute -- the reality that a financially dependent partner who is a party to a palimony agreement may be unable to afford counsel. Nor can we ignore the irony that, under N.J.S.A. 25:1-5(h), the parties cannot enter a palimony agreement without counsel, but can stand in a courtroom and argue for the enforcement of such an agreement without counsel.

Last, we consider the "public need" for mandated attorney review of palimony agreements when no other family-law agreement or private contract (to our knowledge) imposes such a requirement. To be sure, attorney review would protect a party -- particularly a dependent party -- from potential overreaching. But attorney review presents another hurdle for parties who want to enter into palimony agreements and almost certainly will result in fewer such agreements, putting aside the impact on those who cannot afford counsel. Additionally, the legislative history of N.J.S.A. 25:1-5(h) does not shed light on why, among all the category of private agreements covered by the Statute of Frauds, only palimony agreements require attorney review.

In light of the nature and importance of the right of willing parties to enter palimony agreements without the burden of attorney participation, we conclude that the imposition of an attorney-review requirement is an arbitrary government restriction that contravenes Moynihan's substantive due process rights. We are therefore constrained to strike down the attorney-review

37

requirement in N.J.S.A. 25:1-5(h). Palimony agreements must still be in writing and signed, if not by both parties, at least by the party against whom the agreement is to be enforced -- just like all agreements enumerated in the Statute of Frauds. See N.J.S.A. 25:1-5.

We therefore enforce the palimony agreement as written in this case.

V.

Next, we consider whether Moynihan and Lynch had an oral palimony agreement before the 2010 enactment of N.J.S.A. 25:1-5(h). We accord deference to a trial court's factfindings, particularly in family court matters where the court brings to bear its special expertise. Cesare v. Cesare, 154 N.J. 394, 413 (1998). Under that deferential standard of review, we are bound to uphold a finding that is supported by sufficient credible evidence in the record. Ibid.; Guido v. Duane Morris LLP, 202 N.J. 79, 95 (2010).

Here, the trial court had the benefit of hearing the witnesses before rendering its decision. We conclude that sufficient credible evidence in the record supports the trial court's determination that Lynch did not make an explicit or implied oral promise to support Moynihan for life. Therefore, the parties did not have an oral palimony agreement before 2010.

That trial court finding is buttressed by the last line of the written palimony agreement, which provides: "This agreement finalizes all

38

obligations of Mr. Lynch to Ms. Moynihan." That last line suggests that, if there were any previous agreements, they were subsumed into the final written agreement. See Atl. N. Airlines, Inc. v. Schwimmer, 12 N.J. 293, 303 (1953) (stating that "[w]here the parties have made the writing the sole repository of their bargain," any previous understandings are barred from consideration); see also Restatement (Second) of Contracts § 209(3) (Am. Law Inst. 1981) ("Where the parties reduce an agreement to a writing which in view of its completeness and specificity reasonably appears to be a complete agreement, it is taken to be an integrated agreement unless it is established by other evidence that the writing did not constitute a final expression.").

In light of our holding that the written palimony agreement is enforceable, we need not address any of the equitable remedies pressed by Moynihan for enforcement of that agreement.

VI.

In summary, we reverse in part and affirm in part the judgment of the Appellate Division. In reversing the Appellate Division, we hold that the palimony agreement, as written and signed, without the requirement of attorney review, is enforceable. That portion of N.J.S.A. 25:1-5(h), which imposes an attorney-review requirement to enforce a palimony agreement, contravenes Article I, Paragraph 1 of the New Jersey Constitution. In

39

affirming the Appellate Division, we uphold the trial court's finding that an oral palimony agreement did not exist before 2010.

We remand to the trial court for proceedings consistent with this opinion.


CHIEF JUSTICE RABNER and JUSTICES PATTERSON, SOLOMON, and PIERRE-LOUIS join in JUSTICE ALBIN's opinion.